Jonathan Shub (SBN 237708)
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
215-238-1700  (phone)
215-238-1968 (fax)
jshub@kohnswift.com

Jennifer Duffy (SBN 171984)
LAW OFFICES OF JENNIFER DUFFY, APC
28649 S. Western Ave. #6571
San Pedro, CA 90734
(310) 714-9779 (phone)
Classaction.com@gmail.com

[Additional Counsel on Signature Page]

Attorneys for Plaintiffs
and all others similarly situated

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CODY SPIEGEL, and CURRY CONAWAY, individually, and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>        v.<br><br>FANDUEL, INC., a Delaware Corporation; and DRAFT KINGS, INC., a Delaware Corporation,<br><br>              Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**(1) CALIFORNIA'S UNFAIR COMPETITION LAW (§ 17200); (2) CALIFORNIA'S FALSE ADVERTISING LAW (§ 17500 *ET SEQ.*)**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Cody Spiegel and Curry Conaway ("Plaintiffs"), individually, and on behalf of all others similarly situated, by and through counsel, bring this action against FanDuel, Inc. ("FanDuel") and DraftKings, Inc. ("DraftKings"), (collectively "Defendants"), and state as follows:

## NATURE OF THE CASE

1. This is a class action complaint against FanDuel and DraftKings, two companies operating daily fantasy sports ("DFS") websites.

2. To create an account with DraftKings or FanDuel, a user must agree to Terms and Conditions in a multi-page internet User Agreement ("User Agreement"). The User Agreement is unconscionable, contrary to public policy, unmanageable and is intended to hide material terms such as arbitration, venue, application of foreign law and as such, its terms are unenforceable against Plaintiffs and Class Members.

3. Congress has deemed fantasy sports a game of skill, not of chance. See 31 U.S.C. §§ 5361-5367. Defendants have attempted to take advantage of 31 U.S.C. §§ 5361-5367 to legitimize fantasy sports.

4. DFS is a non-regulated industry where individuals compete against other individuals in fantasy sports games on a daily basis. That is, Defendants operate tournaments where individuals accumulate points based on the real-life statistics of

players in professional sporting events that occur on a particular day. Individuals can play for free or pay money to compete for cash prizes.

5.  To begin playing on DraftKings or FanDuel, an individual is required to place a deposit and create an account. That deposit can then be used to pay entry fees to partake in daily fantasy sports games. At the end of the sports day, the winner of each fantasy contest is then awarded prize money which is inserted into their account.

6.  The competitions vary by sport and format, but the most popular forum is daily or weekly fantasy football. In a typical competition, customers "buy-in"— anywhere from $1 to thousands of dollars—against other participants with hopes that they will field the best fantasy football "team." The basic format for fantasy sports is best typified by a typical bet on a NFL game.

7.  Defendants generate their revenue by hosting competitions among individual users and, for their services, take a "rake" of the earnings.

8.  Though the rake varies by game type and amount, it normally hovers around 10 percent. In a typical competition wherein 10 players bet $10 each in a winner-takes-all format, the champion will walk away with $90 of the $100, with Defendants, FanDuel and DraftKings, taking its 10 percent rake of $10.

9.  The difference between the entry fees in the prize pool and the guarantee is called the "overlay" and gives Defendants additional incentive to attract as many

Class Action Complaint

users and entries as possible into contests to avoid having to pay out this overlay or they have their own employees win prize pool money through inside information.

10.  DraftKings refers to is new users as "fish" and relies on new users who lack skill to keep its most active users – and therefore profitable entry fee generators – on their site.[1]  According to one analysis, the top 1.3% of players paid 40% of the entry fees, and the most active 6.3% of players paid 76% of entry fees.[2]

11.  The CEO of FanDuel also recognized the need to attract as many new, inexperienced players as possible to keep its most profitable players happy.[3]

12.  These material misrepresentations and omissions fraudulently induced Plaintiffs and the proposed class to give Defendants money, which ultimately went to Defendants and their employees through fees and contest prizes.

13.  Specifically, Plaintiffs deposited and risked thousands of dollars on FanDuel and DraftKings tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect their rights, nor would any of the members of the proposed classes.

---

[1] *Id.*; *see also* https://rotogrinders.com/threads/dk-frequent-player-points-130623; https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=5; (accessed Oct. 7, 2015) (posts by user JRobs, the online screen name for DraftKings CEO Jason Robins)

[2] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (accessed Oct. 7, 2015)

[3] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=10 (accessed Oct. 8, 2015)

Class Action Complaint

## **PARTIES, JURISDICTION AND VENUE**

14.  Plaintiff Cody Spiegel is a resident of Los Angeles, California, and a citizen of California. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.

15.  Plaintiff Curry Conaway is a resident of La Quinta, California, and a citizen of California. He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.

16.  Defendant DraftKings, Inc., is incorporated in Delaware with a principal place of business at 125 Summer Street, Fifth Floor, Boston, MA 02110. Its registered agent for service of process is Jason Robins, 376 Boylston Street, Suite 501, Boston, MA 02110. DraftKings is a citizen of the States of Delaware and Massachusetts.

17.  Defendant FanDuel, Inc., is a Delaware corporation with a principal place of business at 19 Union Square West, 9th Floor, New York, NY 10003. Its registered agent for service of process is ATA Corporate Services, LLC, 222 Delaware Avenue, Suite 1200, Wilmington, DE 19801. FanDuel is a citizen of the States of Delaware and New York.

18.  This Court has subject matter jurisdiction over both the parties and the subject matter because a substantial number of the events giving rise to this complaint occurred in California.

Class Action Complaint

19.  Additionally, the Central District of California is the proper venue for this action because some of the events giving rise to the complaint occurred here.

## **BACKGROUND**

20.  Defendants are able to operate their websites because they market DFS as a game of skill.

21.  Defendants held themselves out to Plaintiffs and the class as places where their skill made a difference between winning and losing. See, e.g., https://www.youtube.com/watch?v=VDa-cDu8KYg).

22.  Similarly, FanDuel advertised (available at http://www.ispot.tv/ad/AVPC/fanduelcom-one-week-fantasy-football-get-paid-for-knowledge) that players could "get paid for [their] knowledge" if they were "smarter than the average fan."

23.  A few individuals garner the vast majority of the monies available as they are equipped with elaborate statistical modeling and automated tools that can manage hundreds of entries at once and identify the weakest opponents.

24.  These elite players are known in the fantasy sports gaming industry as "Apex predator" bettors or "Shark" bettors.

25.  Data and information are the biggest commodities and provides players with the biggest advantage.

26.  Apex predator and Shark bettors use elaborate computer programs and algorithms called "robots," "spiders," "scrapers," "sniping software," "scripts" and

Class Action Complaint

other methods to gain an unfair advantage over unsuspecting Class Representatives and Class Members.

27.  Defendants DraftKings and FanDuel have failed to disclose to Class Representatives and Class Members that Apex predator and Shark bettors have an unfair advantage by obtaining better information from DraftKings and FanDuel – a situation that is tantamount to insider trading because the information was not provided to Class Representatives and Class Members.

28.  DFS is not considered gambling because of the alleged skill involved in picking a winning team.  According to DraftKings, it  attracts players "who are analytical and favor data and research… [The DFS players] do their homework. It's like the stock market. They enjoy looking at something and trying to figure out something that someone else doesn't see."[4]

29.  Furthermore, DraftKings and FanDuel employees have access to this valuable information.  For instance, DraftKings performs analytics to determine winning strategies, return on investment of certain strategies and even how lineups on FanDuel would do if they were entered into DraftKings contests.  In addition to years of data on optimal strategies, which gives Defendants' employees a huge advantage over even the most "skilled" DFS players, Defendants' employees also

---

[4] Howard Stutz, *DraftKings CEO Compares Fantasy Sports to Chess, Stock Investing*, Las Vegas Review-Journal, (Sept. 29, 2015), available at http://www.reviewjournal.com/business/casinos-gaming/draftkings-ceo-comparesfantasy-sports-chess-stock-investing (last visited Oct. 7, 2015)

Class Action Complaint

have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

30.   Because the goal is to beat the other players, a player with statistical data about ownership percentages of competitors would have an edge over players without this data in many ways, including the ability to make rosters with enough players different from competitors' rosters.

31.   Indeed, a DraftKings employee, Ethan Haskell, accidentally posted ownership percentages online before they were supposed to be publicly available – that is, before all of the contestants' lineups were "locked" and could therefore still be changed. This employee initially claimed he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site."[5]

32.   However, the same week that he posted roster data before he was supposed to, Haskell played on FanDuel and beat 229,883 entrants, coming in 2nd and personally winning $350,000.[6] An analysis of this employee's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com covering DFS to inside DraftKings, working for a DFS company.

---

[5] https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635 (accessed Oct. 7, 2015).

[6] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (accessed Oct. 7, 2015).

Class Action Complaint

33.  Below is a chart depicting Haskell's success playing major league baseball fantasy games on FanDuel in August of 2015, during a period when he had inside information from DraftKings[7]:

**Ethan Haskell's absurd success playing FanDuel MLB in August 2015**

|  | First Cash | Second Cash | Third Cash | Fourth Cash |
|---|---|---|---|---|
| 8/1/2015 | 1st of 1810 in $40K MLB | 6 of 147 in $4 million MLB qualifier | | |
| 8/2/2015 | 28 of 4597 in $100K MLB | 32 of 4597 in $100K MLB | | |
| 8/3/2015 | 7th of 555 in $150K MLB | 4 of 166 in $15K MLB | | |
| 8/4/2015 | 34 of 8045 in $175K MLB | | | |
| 8/5/2015 | 7th of 740 in $200K MLB | 12 of 185 $50K MLB | 3 of 112 in $10K MLB | 60 of 5747 in $125K MLB |
| 8/7/2015 | 10 of 2506 in $4 million MLB qualifier | | | |
| 8/8/2015 | 8 of 102 in $4 million qualifier | | | |
| 8/9/2015 | 11 of 5287 in $115K MLB | | | |
| 8/10/2015 | 1st of 5747 in $125K MLB | 58 AND 86 of 740 in $200K MLB | | |
| 8/11/2015 | 13 of 1059 in $300K MLB | 58 of 7356 in $160K MLB | | |
| 8/12/2015 | 20 of 2667 in $60K MLB | *larrybrownsports.com* | | |
| 8/18/2015 | 1st of 12889 in 300K MLB | 31 of 12889 in $300K MLB | | |
| 8/20/2015 | 26 of 740 in $300K MLB | | | |
| 8/21/2015 | 3rd of 740 in 200K MLB | 34 of 740 in $200K MLB | 36 of 9195 in $200K grand slam | |
| 8/22/2015 | 54 of 687 in $200K MLB | | | |
| 8/24/2015 | 35 of 1111 in $300K MLB | | | |
| 8/25/2015 | 6 of 1333 in 400K MLB | 30 of 7078 in $160K | | |
| 8/28/2015 | 53 of 1050 in $300K MLB | | | |
| 8/30/2015 | 44 of 4597 in $100K MLB | | | |
| 8/31/2015 | 51 of 2180 in $700K MLB | 115 of 2180 in $700K MLB | | |

34.  DraftKings and FanDuel, in concert, said that this employee beating 229,883 people the same week it was clear he had access to ownership data was a "coincidence."[8]

35.  In all, DraftKings employees have won at least $6,000,000 playing at FanDuel, which is more than one million dollars per year considering DraftKings

---

[7] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (accessed Oct. 16, 2015)

[8] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasysports-but-didnt-expect-uproar/ (accessed Oct. 7, 2015)

Class Action Complaint

is only a few years old.[9]  The ability of FanDuel to calculate that information within days of public knowledge shows that FanDuel can track which players are from other DFS sites and can track how much they are winning, losing or otherwise what the possibility is that other DFS employees are using nonpublic information, data and insider strategic information.

36.  DraftKings was well aware of its employees playing at FanDuel, and aware that some of its employees made more money from winnings on FanDuel than their actual salaries.[10]

37.  FanDuel profiled one of its own employees who played on other sites and had won $50,000 in a short period of time, but has since removed the article from its website.[11]

38.  According to Legal Sports Report (LSR), an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees often executives – of other sites.' (From a DFS operator's point of view, a "whale" is simply a high-volume player that generates significant

---

[9] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (accessed Oct. 7, 2015)

[10] https://www.bostonglobe.com/business/2015/10/05/draftkings-bans-employees-from-competitorssites/s36ig5e0eV0OR9C55R8hwL/story.html (Oct. 7, 2015)

[11] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (accessed Oct. 7, 2015)

Class Action Complaint

revenue, not necessarily a winning or losing player.)"[12] FanDuel's CEO admitted to personally playing on competitor sites[13].

39.   Had Plaintiffs and/or members of the proposed class known that Defendants were working in concert to allow employees of DFS sites to play against them, Plaintiffs and members of the proposed class would not have played on Defendants' websites.

40.   Had Plaintiffs and/or members of the proposed class known that Defendants had acted in concert to sanction this practice, Plaintiffs and members of the proposed class would not have played on Defendants' websites.

41.   Overall, Plaintiffs deposited thousands of dollars on FanDuel and DraftKings before the disclosure of the fact that DFS employees were playing with inside information.

42.   After disclosure of the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites, DraftKings and FanDuel issued numerous joint and/or identical statements on their websites, continuing to act in concert.

43.   DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material

---

[12] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/ (Oct. 7, 2015)

[13] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=3 (Oct. 7, 2015)

fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site.

44.   Ultimately, Defendants together changed their internal rules to both prevent their employees from playing on other DFS sites and to prevent DFS employees from playing on their sites.

### C. The FBI and U.S. Justice Department Investigation

45.   Numerous lawmakers have called out for federal regulation and inquiries into the Daily Fantasy Sports industry, specifically FanDuel and DraftKings.

46.   Connecticut Senator Richard Blumenthal formally called for a federal investigation into any deceptive or fraudulent practices at daily fantasy sports leagues:

> "Consumers had no foreseeable knowledge that these companies were facilitating employees' use of proprietary data to provide themselves with an advantage when playing users on their rival site," Blumenthal said in a letter to the Justice Department and the F.T.C. "If employees are using insider information to unfairly advantage themselves over others, this may constitute fraud regardless of any other federal or state gambling statutes."[14]

47.   Senate Minority Leader Harry Reid has also called for increased federal examination of daily fantasy sports after news of the scandal broke.[15]

48.   According to Reid, "We learned . . . that there's absolutely scandalous conduct taking place [within Daily Fantasy Sports]." Reid further called on

---

[14] http://www.nytimes.com/2015/10/15/sports/draftkings-fanduel-fbi-investigation.html?_r=0 (accessed October 15, 2015

[15] http://www.huffingtonpost.com/entry/congress-harry-reid-daily-fantasy-sports-scandal_56141db2e4b022a4ce5fc344 (accessed October 15, 2015)

Class Action Complaint

Congress to investigate these companies: "I think it should also be a warning shot to everybody that online gaming is a real scary thing and we'd better look at all of it."[16]

49.  Reid's call for legislative action was answered, as it has been reported that the U.S. Justice Department and the Federal Bureau of Investigation have begun probing whether the business model of daily fantasy sports operators violates federal law.[17]

50.  Furthermore, the New York Attorney General's office has asked both companies for internal data including the win/loss records of players, algorithms that determine the fantasy pricing for athletes and details on their policies to prevent fraud.[18]

51.  It has also been reported that the Massachusetts Attorney General's office is investigating the DFS industry.[19]

52.  DFS players have also said they were being interviewed by agents from the FBI's Boston office, seemingly focused on DraftKings, a Boston-based company.[20]

53.  As of the date of filing this Complaint, the investigation is still ongoing.

---

[16] Id.

[17] http://www.wsj.com/articles/fbi-justice-department-investigating-daily-fantasy-sports-business-model-1444865627 (accessed October 15, 2015)

[18] Id.

[19] Id.

[20] Id.

## DraftKings's and FanDuel's Terms of Use is Not a Valid, Enforceable Contract

54.  Plaintiffs and the class were fraudulently induced into placing money onto DraftKings and FanDuel because they are supposed to be a fair game of skill without the potential for insiders to use non-public information to compete against them.

55.  The so-called "Terms of Use" do not constitute a valid, mutual agreement because the promises made by DraftKings and FanDuel are illusory. Indeed, there is no restriction on DraftKings' and FanDuel's ability to terminate the "agreement" or to refuse to perform. For example, the so-called "Terms of Use" provide that DraftKings, FanDuel, and related individuals such as officers and directors are released from any liability for any claim by the user "whatsoever": By entering into a Contest or accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify, release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to … [examples of various types of liability listed].

56.  Another reason why the so-called "Terms of Use" is an illusory contract is that it purports to reserve to Defendants the right to deny service to any user for any reason "whatsoever": "DraftKings reserves the right, in its sole and absolute

Class Action Complaint

discretion, to deny any contestant the ability to participate in head-to-head contests for any reason whatsoever." Thus, DraftKings is not bound to any performance obligation. FanDuel has similar language in that it "reserves the right, in its sole discretion, to disqualify any individual."

57.  Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give DraftKings the right, "without prior notice," to "revoke any or all of your rights granted hereunder." Thus, once again, DraftKings is not bound to any performance obligation.

58.  The Terms of Use purport to require arbitration, but gives DraftKings the exclusive right to revoke the arbitration provision because it states that "Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts."

59.  In addition, a user only has to check a box saying he or she has read the Terms of Use to sign up for the website, and the deposit of money and entry into contests is done through separate transactions.

60.  The Terms of Use are procedurally and substantively unconscionable.

61.  As a direct and proximate result of the actions described above, Plaintiffs and members of the proposed classes have been damaged.

## <u>CLASS ALLEGATIONS</u>

Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.  The classes which plaintiffs seek to represent are:

**"All individuals or entities who played DFS on Defendants' websites in California during the class period."**

62.   Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

63.   Excluded from the classes are defendants, their parents, subsidiaries, affiliates, officers and directors, any entity in which any defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

64.   The members of the classes are so numerous that joinder is impracticable.  While the exact number and the identities of members of the classes are unknown at this time and can only be ascertained through investigation and discovery in this action.

65.   The claims of the representative plaintiffs are typical of the claims of the classes in that the representative plaintiffs, like all members of the classes, used Defendants' websites to play DFS.  The representative plaintiffs, like all members of the classes, have been damaged by Defendants' misconduct in that they were

subject to defendants' unfair, unjust, and deceptive behavior with regard to trading private information as described herein.

66. Among the common legal and factual questions arising out of the claims asserted on behalf of the classes include, without limitation:

a. Whether Defendants made the representations set forth above and substantially similar representations to Plaintiffs and members of the proposed classes;

b. Whether Defendants' advertisements were false, misleading or unfair;

c. Whether Defendants owed duties to Plaintiffs and the proposed classes, the scope of those duties and if they breached those duties;

d. Whether Defendants fraudulently induced Plaintiffs and the proposed classes into using their website under false pretenses, through material misrepresentations or material omissions;

e. Whether consumers were harmed by Defendants' actions as described above;

f. Whether the Terms of Use are unconscionable, illusory, fraudulent or otherwise invalid;

g. The extent of the damages caused by Defendants' acts.

h. Whether Defendants' employees used non-public data and/or information to gain an advantage at DFS sites, whether Defendants acted in concert to condone, allow or promote this practice, or

whether Defendants were negligent in allowing employees to access

and use confidential data, or were negligent or committed fraud in

failing to disclose to Plaintiffs and the proposed classes that these

practices were occurring.

67.   Plaintiffs' claims are typical of the claims of the other members of the

classes, in that they arise out of the same deceptive practices conducted by

defendants, false and misleading advertisements of fair play, and lack of

information about having to compete against players with inside information.

68.   Plaintiffs will fairly and adequately protect the legitimate interests of the

members of the classes because: (1) plaintiffs have no interests antagonistic to the

interests of the other members of the classes; (2) plaintiffs' interests are aligned

with the interests of the classes; and, (3) plaintiffs understand the nature of these

allegations and their responsibilities as class representatives to represent the

interests of those persons who have been injured.

69.   Plaintiffs are committed to the vigorous prosecution of this action and have

retained attorneys who are experienced in the prosecution of class actions,

including consumer class actions, who have done significant work investigating or

identifying potential claims in this litigation, and who have committed and will

continue to commit substantial resources to representing the classes.

70.   A class action is superior to other available methods for the fair and

efficient adjudication of this controversy.  Since the amount of each individual

Class Action Complaint

class member's claim is small relative to the complexity of the litigation, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the classes would have no other suitable method of redress for the injuries they suffered and continue to suffer.

71. Additionally, even if members of the classes themselves could afford such individual litigation, the court system could not. Individualized litigation would significantly increase the delay and expense to all parties and to the Court.

72. The proposed Classes and/or subclasses are described as follows:

> **"All persons in the United States who deposited money into a DraftKings or FanDuel account before October 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel or any other DFS site."**

73. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

74. Plaintiffs will fairly and adequately protect the interests of the class. The interests of the class representative are consistent with those of the other members of the classes. In addition, Plaintiffs are represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

75.  The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

76.  Excluded from the Class are:

a.  Defendants and any entities in which Defendants have a controlling interest;

b.  Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants;

c.   The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

d.  All persons or entities that properly execute and timely file a request for exclusion from the Class;

e.  Any attorneys representing the Plaintiffs or the Class.

## COUNT I

## (NEGLIGENCE)

77.  Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

78.  DraftKings and FanDuel owed duties to Plaintiffs and the proposed classes as a user and paying customer of its site to use reasonable care to provide true, reliable and safe information and contests.

79. DraftKings and FanDuel breached its duties to Plaintiffs and the proposed classes by failing to prevent persons with inside information and data by virtue of their employment at other DFS sites from competing against Plaintiffs and the proposed classes.

80. In the course of their business, profession and employment, Defendants and their agents, representatives and employees supplied false information to Plaintiffs, the proposed classes.

81. Plaintiffs and the proposed classes justifiably relied upon the information supplied by Defendants, and, as a result, engaged in business with Defendants and lost money.

82. Defendants failed to use reasonable care in communicating the information about safety and security of data, employee access to data and ability of employees to use material, non-public data to compete against Plaintiffs and the proposed classes on other websites, or allow employees of other companies with material, non-public access to compete on the website where Plaintiffs and the proposed classes competed.

83. As a direct and proximate result of Defendants' negligence, Plaintiffs and the proposed classes were damaged in an amount to be proven at trial.

## **COUNT II**

### **(Violations of the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*)**

84. Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if set forth fully herein.

85. Defendants disseminated or caused to be disseminated materially untrue and misleading advertising described in this Complaint with the intent to directly or indirectly induce plaintiffs and members of the classes to deposit more money into their accounts.

86. The foregoing false advertisements are misleading in a material way because they fundamentally misrepresent the fair play available on their websites.

87. The advertising misrepresenting the fair play available on defendant's websites were untrue, misleading, and deceptive as set forth in this Complaint.

88. When defendants disseminated the advertising described herein, they knew or by the exercise of reasonable care should have known, that the statements concerning fair play  were untrue or misleading, or omitted to state the truth about the fair play in violation of the False Advertising Law, as set forth in Cal. Bus. & Prof. Code § 17500, *et seq*.

89. Plaintiffs and the classes seek restitution, disgorgement, injunctive relief, and all other relief allowable under § 17500, *et seq*.

## **COUNT III**

### **(Violations of Unfair Competition law, Cal. Bus. & Prof. Code § 17200)**

90. Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if set forth fully herein.

91.  Defendants' conduct described herein violated the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, *et seq.*, because defendants engaged in unfair competition by knowingly taking funds for play when the game was simultaneously played by players having insider knowledge about the game.  Defendants' customers had no reasonable expectation that they would be playing a game that was not fair because players had unfair advantages with inside information.  As described herein, defendants' business practices are unethical, oppressive, and/or offend established public policies.

92.  Defendants also failed to disclose to customers that they would be playing against players with inside information or play a game with unfair circumstances.  Defendants' omissions described herein have deceived members of the public.

93.  Plaintiffs and members of the classes have been actually harmed and suffered injury-in-fact as a result of defendants' conduct.

94.  As a result of the conduct described herein, defendants have been unjustly enriched at the expense of plaintiffs and members of the classes.

95.  Plaintiffs and the classes are entitled to equitable relief, including restitution of improperly retained income and disgorgement of profits, attorneys' fees and costs, and permanent equitable relief to prevent such conduct in the future.

96.  Defendants' unfair business practices described herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to consumers, including plaintiffs and members of the classes.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and members of the proposed classes pray for relief and judgment against Defendants, as follows:

a.   For an order certifying the Class, appointing Plaintiffs and their counsel to represent the Class and notice to the Class to be paid by Defendants;

b.   For damages suffered by Plaintiffs and the proposed classes;

c.   For restitution to Plaintiffs and the proposed classes of all monies wrongfully obtained by Defendants;

d.   For injunctive relief requiring Defendants to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e.   An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

f.   For Plaintiffs' reasonable attorneys' fees, as permitted by law;

g.   For Plaintiffs' costs incurred;

h.   For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

i.   For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all counts so triable.

Dated: October 20, 2015               Respectfully Submitted By:

                                      s/ Jonathan Shub
                                         Jonathan Shub

                                      Jonathan Shub (SBN 237708)
                                      KOHN, SWIFT & GRAF, P.C.
                                      One South Broad Street, Suite 2100
                                      Philadelphia, PA 19107
                                      215-238-1700
                                      215-238-1968 (fax)
                                      jshub@kohnswift.com

                                      Jennifer Duffy (SBN 171984)
                                      LAW OFFICES OF JENNIFER DUFFY,
                                      APC
                                      28649 S. Western Ave. #6571
                                      San Pedro, CA 90734
                                      (310) 714-9779 telephone
                                      Classaction.com@gmail.com

                                      Jeffrey A. Leon *(Pro Hac Vice forthcoming)*
                                      QUANTUM LEGAL LLC
                                      513 Central Avenue
                                      Suite 300
                                      Highland Park, Illinois 60035
                                      (847) 433-4500

                                      *Counsel for the Plaintiffs and Putative Class*

- 25 -